*United States v. Johnson*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2022
No. 22-1289

**UNITED STATES OF AMERICA,**
*Appellee*,

v.

**RICKEY JOHNSON, AKA SEALED DEFENDANT 1,
AKA NEIL DAWN DEFARREN,**
*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: JUNE 6, 2023
DECIDED: SEPTEMBER 6, 2024

---

Before: CHIN and MENASHI, *Circuit Judges*, and ENGELMAYER, *Judge*.*

---

* Judge Paul A. Engelmayer of the United States District Court for the Southern District of New York, sitting by designation.

Defendant Rickey Johnson was convicted of making threatening interstate communications and of threatening United States officials. He argues that five purported errors over the course of the trial require vacatur of his convictions: (1) the district court proceeded with eleven jurors prior to deliberations and without stipulation from the parties, (2) the district court dismissed two jurors for other than "good cause," (3) an email from one of the victims was admitted in violation of the rule against hearsay evidence and in violation of the Confrontation Clause, (4) the district court erroneously delivered an "uncalled witness charge" prohibiting adverse inferences from a lack of testimony, and (5) the district court improperly admitted expert testimony as lay testimony. With respect to each argument, we conclude either that the district court did not err or that the error was harmless. We affirm the judgment of the district court.

Judge Chin dissents in a separate opinion.

―――――――

COLLEEN P. CASSIDY, Federal Defenders of New York, New York, NY, *for* Defendant-Appellant.

KYLE A. WIRSHBA, Assistant United States Attorney (Patrick R. Moroney, Stephen J. Ritchin, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for* Appellee.

―――――――

MENASHI, *Circuit Judge*:

In 2021, Defendant-Appellant Rickey Johnson posted videos and sent private messages on Instagram in which he threatened Fox

News hosts Greg Gutfeld and Laura Ingraham, Senator Joe Manchin, and Representative Lauren Boebert. Given the seriousness of the threats, Johnson was indicted on four counts. Counts One and Four charged Johnson with making threatening interstate communications in violation of 18 U.S.C. §§ 875(c) and 2; Counts Two and Three charged Johnson with threatening United States officials in violation of 18 U.S.C. §§ 115(a)(1)(B), (b)(4), and 2.

During the five-day jury trial in February 2022, the district court dismissed three jurors: Alternate No. 2, Juror No. 7, and Juror No. 2. The district court dismissed Alternate No. 2 on the second day of the trial due to a medical emergency. It dismissed Juror No. 7 and Juror No. 2 on the final day of the trial—just hours before the jury retired to deliberate—due to a lack of childcare arrangements and a finding of bias, respectively. The three dismissals reduced the jury to eleven members.

At trial, the jury did not hear directly from the victims. However, the jury did hear testimony from others who had contact with the victims. Special Agent Brandon Kelley, a member of the Threat Assessment Section of the U.S. Capitol Police, testified that he examined the threats and contacted the victims to make security arrangements. The director of corporate security at Fox Corporation, Clifford Cid, also testified. During Cid's testimony, the government offered into evidence an email from Gutfeld to Cid that reported receiving a death threat from Johnson's Instagram account.

At the close of the trial, over the objection of the defense and without stipulation from the parties, the district court permitted the eleven-member jury to proceed to deliberate. After about one day of deliberation, the jury returned a guilty verdict on Counts One, Two, and Four. At the close of the following day, the jury returned a verdict

of not guilty on Count Three. The district court sentenced Johnson to twenty-four months of imprisonment on each count of conviction—to run concurrently and to be followed by three years of supervised release—and imposed a mandatory special assessment of $300.

On appeal, Johnson argues that five purported errors by the district court require vacatur of his convictions: (1) the decision to proceed to deliberation with eleven jurors, (2) the dismissals of Alternate No. 2 and Juror No. 2, (3) the admission of Gutfeld's email to Cid, (4) the delivery of an "uncalled witness" charge to the jury prohibiting adverse inferences to be drawn from the absence of victim testimony, and (5) the admission of Kelley's testimony as lay rather than expert testimony. With respect to each purported error, we conclude either that the district court did not err or that the error was harmless. We affirm the judgment of the district court.

**BACKGROUND**

**I**

On the morning of January 30, 2021, Rickey Johnson sent a series of private messages to Fox News host Greg Gutfeld on Instagram. The messages were brief but stated unambiguously "you will be killed." App'x 566. Gutfeld forwarded these messages by email to Clifford Cid, the director of corporate security at Fox Corporation, with the subject line "Death threat." *Id.* at 29. Gutfeld added the following note: "Mentions me and Jesse [Watters] and Katie Pavlich. That is coming thru from his Instagram account to my Facebook. If you go to his Instagram account which is under his same name you'll see that he says he's in [M]anhattan." *Id*. Cid notified the New York City Police Department ("NYPD") about the messages.

On February 3, 2021, Johnson posted three videos on his Instagram account. Each video featured clips from Fox News with

Johnson speaking over the footage. The first video threatened Gutfeld and Senator Joe Manchin. As the camera zoomed in on Gutfeld appearing in a segment with other commentators, Johnson stated:

> You know how y'all sit and talk about and support the people who use the Constitution to kill people? I am going to take your life. I am going to tell you before I do it, like I am doing right now, but I'm gonna look you in your fucking eye, and I'm gonna take your fucking life, and everyone that knows I took your life is gonna know why.

*Id.* at 576-77. The video then featured a clip of Manchin. As the camera focused on Manchin, Johnson stated: "He's dead. He is fucking dead. He's a Republican that wants to defund the people." *Id.* at 571. Johnson continued:

> Joe Manchin will be executed. He can stop the American people's money. I don't give a fuck about all this politics. That bitch is on American soil. 450,000 Americans, on American soil. I wanna know who's who. We gonna see how these motherfuckers out here vote. I'm killing their ass. You think I'm joking. And you gonna know I fucking did it.

*Id.* at 574. In the caption of the video, Johnson tagged Manchin's official Instagram account and wrote "bitch, you are a terrorist, and will be held accountable for your treason." Supp. App'x 1.

Johnson made similar threats against Fox News host Laura Ingraham and Representative Lauren Boebert in the two other videos he posted on February 3. Over footage of Ingraham speaking, Johnson said:

> Laura, you should stop but you're not because you're paid to kill people. Laura Ingraham, you will be killed. I

5

want you dead. You are a racist, domestic terrorist. … I want this white woman dead. I want Laura Ingraham dead. I want Laura Ingraham murdered. Shout-out Washington, D.C. I'm gonna kill you, Laura Ingraham. … Laura Ingraham, I am going to personally kill you. No, we're targeting on you. I am going to kill you.

App'x 581-85. Over footage of Boebert, Johnson said: "You don't terrorize me. I'm going to kill you. No no no no no. We kill people who violate the Constitution. You are a self-proclaimed terrorist to the American people." *Id.* at 579. When in the footage Boebert smiled, Johnson stated: "Smile, I am going to kill you. You are proud to terrorize the United States Constitution." *Id.* In the caption, Johnson tagged Boebert's official Instagram account along with the official accounts of Governor Ron DeSantis and the U.S. Department of Justice.

The NYPD, having learned of Johnson's Instagram account from Cid, alerted the U.S. Capitol Police. On February 4, 2021, Special Agent Brandon Kelley of the Threat Assessment Section of the Capitol Police reviewed the Instagram account. He then contacted the offices of Manchin and Boebert. Manchin's office requested that security patrols be stationed outside the senator's residence in West Virginia, and Kelley arranged the patrols. Kelley also informed Boebert's chief of staff about a "possible threat." *Id.* at 208-09. Kelley requested Boebert's schedule in order to provide extra security in Washington and asked if she wanted patrols at her home in Colorado. Boebert did not request security in Colorado, however, so it was not arranged. The NYPD arrested Johnson on February 11, 2021.

A superseding indictment filed on January 12, 2022, charged four counts. Counts One and Four charged Johnson with making

6

threatening interstate communications—to Gutfeld and Ingraham, respectively—in violation of 18 U.S.C. §§ 875(c) and 2. Counts Two and Three charged Johnson with threatening United States officials—Manchin and Boebert, respectively—in violation of 18 U.S.C. §§ 115(a)(1)(B), (b)(4), and 2.

**II**

The trial began on February 16, 2022. Twelve jurors and two alternates were selected, and the jury heard opening statements and testimony from Kelley. The next morning, February 17, one of the alternate jurors—Alternate No. 2—informed the district court that she had spent all night in the emergency room due to a swollen lip and that she would not be able to arrive at the courthouse until the early afternoon. The defense requested that the district court wait for Alternate No. 2 to arrive before resuming the trial, and the government asked for her to be dismissed so the trial could proceed. The district court decided to dismiss Alternate No. 2 and to proceed.

That same morning, the district court also considered an incident involving Juror No. 2. Detective David Cowan of the NYPD, who had been involved in investigating Johnson, informed the district court of statements that he had heard from Juror No. 2 while standing outside the courtroom during a recess the day before. According to Cowan, Juror No. 2 had said that "the white man stole Manhattan from the Native Americans"; "Abraham Lincoln did not want to free the slaves" but did so "because the northern states had [an] interest in cheap labor"; "General Sherman and another general from the Union Army slaughtered the plains Indians" when constructing the intercontinental railroad; and "the white man killed the Native Americans who had tobacco farms in the United States" because of the financial interests of Englishmen in tobacco. *Id.* at 181.

7

According to Cowan, Juror No. 2's statements were initially addressed to a group including the other jurors, an attorney from Fox Corporation, and Cowan himself. But as others moved away, Juror No. 2 directed his commentary toward Cowan. It appeared to Cowan that Juror No. 2 provided these historical reflections unprompted. During the same morning, the district court alerted the parties to a second incident involving Juror No. 2 in which he apparently "approached … the lady who brought coffee to the jurors and started talking to her." *Id*. at 167.

The district court asked Juror No. 2 about his statements to Cowan, and Juror No. 2 denied ever speaking to Cowan and became indignant. He demanded that the district court identify his "accuser," and the district court told Juror No. 2 to "calm down." *Id.* at 174. Juror No. 2 acknowledged speaking to the woman with the coffee, but he said that he did not discuss the case with her. *Id.* at 175.

The government urged the district court to excuse Juror No. 2 on the grounds that he was a "disruption" to the other jurors and that he would be unable to "remain unbiased" because he associated Cowan—whom he believed had accused him unjustly—with the prosecution. *Id.* at 183-84. The district court recognized that Juror No. 2's statements "certainly contradict[ed] credible testimony by Detective Cowan as to whether he talked to Cowan," but the district court permitted Juror No. 2 to remain on the jury pending further consideration. *Id.* at 189. Later that day, the district court observed Juror No. 2 asleep during testimony and admonished him. Juror No. 2 responded that "[m]y eyes were opened," and the district court said, "Oh, no they weren't." *Id.* at 302.

Also on February 17, during Cid's testimony, defense counsel objected to the government's effort to admit Gutfeld's email to Cid on

the grounds that the email was hearsay and that its admission violated the Confrontation Clause. Defense counsel argued that the government was trying to introduce "inadmissible hearsay by claiming they are not offering it for its truth when that is what they want to do" and that Johnson's "Sixth Amendment right to confront the witnesses against him would be in violation by having this witness bring in statements that we believe are testimonial under *Crawford*, and Mr. Johnson would not have the ability to cross-examine this witness." *Id.* at 252. After hearing argument from defense counsel and from the government, the district court decided that the email was an "excited utterance," given the "relatively compressed time frame" between when the Instagram messages were sent and when Gutfeld composed it. *Id.* 259-60.[1] The district court provided a limiting instruction to the jury that the email was "in evidence solely for you to consider with respect to Mr. Gutfeld's state of mind when he received the Instagram post." App'x 263-64.

The following morning—February 18—the district court informed the parties that another juror, Juror No. 7, would be excused. The juror had notified the district court that he was "unlikely in the next couple of days to be able" to attend the proceedings due to a lack of childcare arrangements. *Id.* at 399. Neither party objected, and Alternate No. 1 replaced Juror No. 7. Twelve jurors remained.

The district court then returned to its consideration of Juror No. 2. The district court said that it did not believe that the sleeping incident required further action or that Juror No. 2 was "untruthful deliberately" when questioned about talking to Cowan. *Id.* at 400. But

---

[1] The district court referred to the timing of "the Instagram post," but it meant the Instagram messages that prompted Gutfeld's email rather than the videos that were posted four days later. App'x 260.

9

the district court recognized that Juror No. 2 was "agitated and upset by the inquiry, which he regarded as the product of an accusation, and obviously, as the product of an unfair and inaccurate accusation." *Id*. The district court decided to excuse Juror No. 2, it explained, because of bias:

> It is entirely likely that [Juror No. 2] attributed what he regards as a false or inaccurate accusation to the prosecution team. The most obvious target is Detective Cowan whom he knows is connected to the prosecution team. But given his level of agitation, and his upset, I conclude that he is at least impliedly biased against the prosecution. The chain of events is just such that I infer that he holds this against the prosecution. He thinks it is unjust and he holds it against him. Now, accordingly, this is a circumstance in which the facts support the presumption of bias, and in any case, my conclusion as the finder of fact on this is that he is actively biased against the government in all of the circumstances.

*Id.* at 400-01.

The district court proceeded with eleven jurors without receiving a stipulation from the parties, explaining that "[u]nder Rule 24, the case can go to the jury with 11 jurors." *Id.* at 401.[2] In response, the defense moved for a mistrial. The district court denied the motion. Following a charge conference, the parties delivered closing arguments, the jury was instructed, and deliberation began. In its instructions to the jury, the district court told the jury not to draw adverse inferences from the absence of testimony from the four targets of Johnson's threats:

---

[2] In fact, a case may go to a jury of eleven members under Rule 23(b). *See* Fed. R. Crim. P. 23(b).

Now, there are a number of people whose names you've heard during the course of the trial who did not come here and testify. I instruct you that both sides had an equal opportunity or lack of opportunity to call those people as witnesses. Therefore, you should not draw any inference or reach any conclusions as to what they would have said had they been called. Their absence should not affect your judgment one way or the other. You should, however, remember my instruction that the defendant is not obliged in a criminal case to call any witnesses or produce any evidence.

App'x 514. The jury deliberated for two hours on February 22 and most of February 23. Late in the afternoon of February 23, the jury returned a verdict of guilty on Counts One, Two, and Four. The jury returned a verdict of not guilty on Count Three at the end of the day on February 24. On May 25, 2022, the district court sentenced Johnson to twenty-four months of imprisonment on each count—to run concurrently and to be followed by three years of supervised release—and imposed a $300 mandatory special assessment. On October 26, 2022, Johnson completed his term of imprisonment and began his term of supervised release.

## DISCUSSION

Johnson identifies five purported errors that, he argues, each require vacatur of his convictions: (1) the district court's decision to proceed with eleven jurors prior to deliberation and without stipulation from the parties, (2) the dismissal of two jurors for other than the "good cause" that Federal Rule of Criminal Procedure 23(b) requires, (3) the admission of Gutfeld's email in violation of the rule against hearsay and the Confrontation Clause of the Sixth Amendment, (4) the delivery of the uncalled witness charge prohibiting adverse inferences to be drawn from the absence of

11

testimony from the victims, and (5) the improper admission of Kelley's testimony regarding the seriousness of the threats. With respect to each purported error, we conclude either that the district court did not err or that the error was harmless. We address each argument in turn.

**I**

Johnson argues that the district court violated Federal Rule of Criminal Procedure 23(b) when it proceeded with an eleven-member jury before deliberation over the objection of the defense. In doing so, according to Johnson, the district court committed a structural error that requires the vacatur of his convictions. We agree with Johnson that the district court erred in proceeding with an eleven-member jury without stipulation from the parties and prior to deliberation. The error, however, was not structural but subject to harmless error review. We conclude that the error in this case was harmless and that vacatur is not required.

**A**

According to Federal Rule of Criminal Procedure 23(b)(1), a "jury consists of 12 persons unless this rule provides otherwise." Fed. R. Crim. P. 23(b)(1). The rule authorizes a smaller jury if, "before the verdict," the parties "stipulate in writing" either that "the jury may consist of fewer than 12 persons" or that "a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins." *Id.* 23(b)(2). Pursuant to a 1983 amendment to the rule, the district court "may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties," if "[a]fter the jury has retired to deliberate," the district court "finds good cause to excuse a juror." *Id.* 23(b)(3).

"Rule 23 incorporates the 'venerable common law tradition' of a twelve-member jury while allowing the district court to reduce that number upon a finding of good cause." *United States v. Ginyard*, 444 F.3d 648, 652-53 (D.C. Cir. 2006) (citation omitted) (quoting *United States v. Araujo*, 62 F.3d 930, 933 (7th Cir. 1995)). The rule can make that allowance because the Supreme Court has said that there is no constitutional right to a twelve-member jury. "[T]he fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.'" *Williams v. Florida*, 399 U.S. 78, 102 (1970) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 182 (1968) (Harlan, J., dissenting)). That decision of the Supreme Court left the issue "to Congress and the States, unrestrained by an interpretation of the Sixth Amendment that would forever dictate the precise number that can constitute a jury." *Id.* at 103.

We have observed, following the decision in *Williams*, that "the absolute right to a jury of twelve that [defendants] possessed prior to the 1983 amendment of Rule 23(b) is no longer viewed as a 'substantial right' by the Supreme Court." *United States v. Stratton*, 779 F.2d 820, 834 (2d Cir. 1985). We therefore have held that the retroactive application of amended Rule 23(b), allowing conviction by eleven jurors, did not violate the *Ex Post Facto* Clause. "Whatever disadvantage to the defendant may occur from reducing the jury size from twelve to eleven is of insufficient proportion to give him a constitutional right to a jury of twelve, and [it] does not affect the substantial rights of the defendant for Ex Post Facto purposes." *Id.* at 835 (citation omitted).

These prior precedents—holding that the right to a twelve-member jury is neither a constitutional nor even a substantial right—mean that a violation of Rule 23(b)'s twelve-member requirement

cannot amount to a structural error. The general rule is that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). We depart from this harmless-error analysis only for "a limited class of *fundamental constitutional errors* that defy analysis by 'harmless error' standards." *Neder v. United States*, 527 U.S. 1, 7 (1999) (emphasis added) (internal quotation marks omitted). Such fundamental constitutional errors "are so intrinsically harmful as to require automatic reversal … without regard to their effect on the outcome." *Id.* "For all other constitutional errors"—let alone for non-constitutional errors— "reviewing courts must apply Rule 52(a)'s harmless-error analysis and must disregard errors that are harmless beyond a reasonable doubt." *Id.* (internal quotation marks and alteration omitted). The Supreme Court has emphasized that "[t]he purpose of the structural error doctrine is to ensure insistence on certain *basic, constitutional guarantees* that should define the framework of any criminal trial." *Weaver v. Massachusetts*, 582 U.S. 286, 294-95 (2017) (emphasis added).

In accordance with the instructions of the Supreme Court, "[c]ourts have recognized a limited number of structural errors, all involving the violation of bedrock constitutional rights." *United States v. Moran-Toala*, 726 F.3d 334, 343 (2d Cir. 2013). Such an error "requires automatic reversal and is not subject to harmless error analysis because it involves a deprivation of a constitutional protection so basic that in its absence, 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" *Bentley v. Scully*, 41 F.3d 818, 823 n.1 (2d Cir. 1994) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). "The 'highly exceptional' category of structural errors includes, for example, the 'denial of counsel of choice, denial of self-representation, denial of a

public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt.'" *Greer v. United States*, 593 U.S. 503, 513 (2021) (quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)).

In the absence of the deprivation of a constitutional right so fundamental that the trial cannot be trusted to perform its function, the Supreme Court "has repeatedly made clear" that we must adhere to "the 'general rule' … that 'a constitutional error does not automatically require reversal of a conviction.'" *Greer*, 593 U.S. at 513 (quoting *Fulminante*, 499 U.S. at 306).

If the general rule applies to all constitutional errors beyond a select few at the constitutional "bedrock," it necessarily applies to non-constitutional errors that are even further removed from that foundation. *Moran-Toala*, 726 F.3d at 343; *see also United States v. Gonzalez-Huerta*, 403 F.3d 727, 734 (10th Cir. 2005) ("[G]enerally speaking structural errors must, at a minimum, be constitutional errors."). Because the right to twelve rather than eleven jurors that Rule 23(b) provides does not implicate the Constitution—at its bedrock or otherwise—we review a violation of that rule for harmless error.[3]

**B**

We recognize that the Fourth Circuit has held that a district court's "decision to excuse the twelfth juror prior to deliberations and

---

[3] The dissenting opinion objects that Rule 23(b) does not "by its terms" provide "a requirement of prejudice." *Post* at 20. But no constitutional provision or procedural rule expressly provides that it applies only when there is prejudice. We nevertheless apply a "strong presumption" that "if the defendant had counsel and was tried by an impartial adjudicator … any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986).

15

absent the defendant's consent" qualified as a structural error. *United States v. Curbelo*, 343 F.3d 273, 285 (4th Cir. 2003). The court said that it could deem that error to be structural "whether violative of the Constitution or not." *Id.* at 280. We agree with the dissenting opinion, however, that the Supreme Court and the appellate courts "have repeatedly made clear that structural errors necessarily must affect a defendant's constitutional rights." *Id.* at 289 (Wilkins, J., dissenting).[4]

Johnson argues that a violation of Rule 23(b) should be considered a structural error because it "affects the very 'framework within which the trial proceeds, rather than simply … the trial process itself.'" Appellant's Br. 36 (quoting *Neder*, 527 U.S. at 8). But the Supreme Court has told us that convening a jury "composed of precisely 12" is "unnecessary to effect the purposes of the jury system" because the number twelve is "wholly without significance." *Williams*, 399 U.S. at 102. Given this precedent, we cannot conclude that a jury must feature twelve members for the trial to "reliably serve its function as a vehicle for determination of guilt or innocence" and to render a judgment that "may be regarded as fundamentally fair." *Fulminante*, 499 U.S. at 310.

---

[4] Other decisions have required a new trial following a violation of Rule 23(b) without a showing of prejudice. *See United States v. Essex*, 734 F.2d 832, 845 (D.C. Cir. 1984) ("[N]o further prejudice need be shown than that the court did not comply with the stipulation and Rule 23(b), *and* that appellant was denied her right to have her case decided by the *unanimous verdict* of the 12 jurors who heard the case."); *United States v. Taylor*, 498 F.2d 390, 392 (6th Cir. 1974) ("[T]he failure of the District Court to comply literally with the terms of Rule 23 requires reversal for new trial."); *see also Araujo*, 62 F.3d at 937; *United States v. Tabacca*, 924 F.2d 906, 915 (9th Cir. 1991). These decisions, however, preceded the Supreme Court's emphasis that structural errors include only "a limited class of fundamental constitutional errors." *Neder*, 527 U.S. at 7.

In other words, deliberation by eleven rather than twelve jurors does not alter "the framework within which the trial proceeds" but is at most "an error in the trial process itself." *Id.* Indeed, the district court in this case dismissed the twelfth juror just before closing arguments and the start of jury deliberation. Had the district court waited a few hours—and dismissed the twelfth juror for cause after the jury had "retired to deliberate"—the district court would not have violated Rule 23(b). Fed. R. Crim. P. 23(b)(3). That small change in timing did not implicate the fundamental fairness of the trial procedure.[5]

Johnson observes that Rule 23 originally codified the holding of *Patton v. United States*, 281 U.S. 276 (1930), that the Sixth Amendment required twelve jurors unless the defendant waived that requirement. Reply Br. 6; *see Patton*, 281 U.S. at 292 ("A constitutional jury means twelve men as though that number had been specifically named."). But the Supreme Court in *Williams* overruled that holding of *Patton*, and Rule 23 has since been amended to allow the district court to proceed with eleven jurors without the consent of the defendant after deliberation has begun. When it revised Rule 23(b), the Advisory Committee explained that "[p]roceeding with the remaining 11 jurors, though heretofore impermissible under rule 23(b) absent stipulation by the parties and approval of the court, is constitutionally permissible" pursuant to the holding of *Williams*.[6]

---

[5] We have likewise subjected the erroneous decision of a district court to seat an incorrect juror in violation of Federal Rule of Criminal Procedure 24(c)—in effect, denying the defendant the proper twelfth juror—to harmless error review. *See, e.g., United States v. Hilts*, 757 F. App'x 56, 58 (2d Cir. 2018); *United States v. Hamed*, 259 F. App'x 377, 378-79 (2d Cir. 2008).

[6] Fed. R. Crim. P. 23 advisory committee's note to 1983 amendment.

Johnson suggests that *Williams* was wrongly decided. *See* Reply Br. 4-5. And there is some support for that position. Justice Gorsuch has argued that "*Williams* was wrong the day it was decided, [and] it remains wrong today." *Khorrami v. Arizona*, 143 S. Ct. 22, 23 (2022) (Gorsuch, J., dissenting from the denial of certiorari); *see also Cunningham v. Florida*, 144 S. Ct. 1287, 1287 (2024) (Gorsuch, J., dissenting from the denial of certiorari) ("In *Williams v. Florida*, this Court in 1970 issued a revolutionary decision approving for the first time the use of 6-member panels in criminal cases. In doing so, the Court turned its back on the original meaning of the Constitution, centuries of historical practice, and a battery of this Court's precedents.") (internal quotation marks and citation omitted). Justice Gorsuch would "reconsider *Williams*" because the twelve-person criminal jury was well-established "[b]y the time of the Sixth Amendment's adoption," and "the Sixth Amendment was widely understood to protect this ancient right." *Khorrami*, 143 S. Ct. at 23 (Gorsuch, J.).[7]

Despite these arguments, "there are not yet four votes on [the Supreme] Court to take up the question whether *Williams* should be overruled," so we remain bound to follow that precedent. *Cunningham*, 144 S. Ct. at 1288 (Gorsuch, J.). Accordingly, we must decline to recognize a new type of structural error that does not affect a constitutional or even a substantial right.

---

[7] The dissenting opinion similarly provides historical evidence for the proposition that "dispensing" with the requirement of twelve jurors "may be considered unconstitutional." *Post* at 19 (quoting 2 Joseph Story, Commentaries on the Constitution of the United States 588 (1858)).

**C**

We agree with Johnson—and the government does not dispute—that the district court violated Rule 23(b) when it proceeded with an eleven-member jury before deliberation without a stipulation from the parties. We review that violation for harmless error.

An "[e]rror is harmless if it is highly probable that it did not contribute to the verdict." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010) (quoting *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010)). We have "repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009).

Johnson argues that the erroneous dismissal of the twelfth juror "[i]n such a close case" cannot be considered harmless. Appellant's Br. 38. We disagree that the case was close. At trial, Johnson did not deny that he posted and sent the threats nor did he dispute that the other statutory predicates had been met, such as that the communications were made in interstate commerce. Johnson's only defense was that he "was not seriously threatening to kill anyone" and that "[n]o reasonable person would view Mr. Johnson's statements as reasonable threats, because they … were vague and general." App'x 454, 459. In our view, the evidence overwhelmingly showed otherwise.

When it instructed the jury, the district court explained that the government needed to prove that each statement was "made in such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to inflict bodily injury or to kill." *Id.* at 498. For Counts One and Four, the government needed to show that Johnson "intended the

19

communication to be received as a true threat or that he knew that the statement would be viewed as a true threat by the person to whom it was directed." *Id.* at 500. For Counts Two and Three, the government needed to show that Johnson delivered the threat "with the intent to impede, intimidate, or interfere with the specified officials while they were engaged in the performance of their official duties or with the intent to retaliate against the officials on account of the performance of their official duties." *Id.* at 505. The evidence here met those standards—and would not have allowed a reasonable juror to draw the contrary conclusion. The jury saw Johnson's videotaped and written statements directly. The language was unequivocally threatening: "I'm gonna look you in your fucking eye, and I'm gonna take your fucking life," *id.* at 576-77; "Joe Manchin will be executed," *id.* at 574; and "Laura Ingraham, you will be killed. I want you dead. … I am going to personally kill you. … I'm going to kill you with my bare hands," *id.* 581-87. Given this direct evidence, the government's case was strong.

A reasonable jury could view these statements only as a series of explicit death threats. Other than the statements themselves, there was no evidence at trial that indicated Johnson's state of mind or intention at the time he transmitted the death threats. The assembled evidence thus did not provide the jury with a basis on which it could reasonably have found that Johnson's intention, in posting the threats, was not culpable. *Cf. Neder*, 527 U.S. at 17 ("[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.").

The conduct of the jury did not indicate that there was significant disagreement over Counts One, Two, and Four. After delivering a guilty verdict on those counts, the foreperson indicated that the jurors viewed Counts One, Two, and Four differently than Count Three, with respect to which she did "not believe [the jury] will be able to reach a consensus." App'x 545.[8] One additional juror participating in the deliberation would not have affected the outcome on the counts that resulted in conviction.

Moreover, Rule 23(b)(3) allowed the district court to proceed to verdict with eleven jurors "even without a stipulation by the parties" if it had dismissed the twelfth juror for good cause "[a]fter the jury has retired to deliberate." Fed. R. Crim. P. 23(b)(3). Thus, as noted above, if the dismissal had occurred just a few hours later—after closing arguments and the jury charge—there would have been no violation of Rule 23(b) but there still would have been deliberation by only eleven jurors. That difference in the timing of the dismissal did not contribute to the verdict.

Because the violation of Rule 23(b) did not affect the outcome of the trial, there is no reasonable doubt that the error was harmless. We conclude that the erroneous decision to proceed with eleven jurors does not warrant vacatur of the judgment of conviction.

---

[8] Jurors may have seen Count Three differently because Kelley described the video contemporaneously to Boebert as only a "possible threat," and Boebert did not take security precautions in response. App'x 118-20, 208-10.

**II**

Johnson next argues that the district court's dismissals of Alternate No. 2 and Juror No. 2 were not justified by "good cause" and amounted to an abuse of discretion. We disagree.

Rule 23(b)(2)(B) allows the parties to stipulate that a jury of fewer than twelve members may return a verdict "if the court finds it necessary to excuse a juror for good cause after the trial begins." Fed. R. Crim. P. 23(b)(2)(B). Johnson argues that—when the district court excused Alternate No. 2 and Juror No. 2 prior to the start of deliberation—the district court violated Rule 23(b) not only because it proceeded without a stipulation but also because "the court's dismissal of Juror 2 and Alternate 2 were unjustified by good cause, and therefore abuses of discretion." Appellant's Br. 39.

We agree that the district court violated Rule 23(b) when it decided—before the jury had retired to deliberate, and without a stipulation from the parties—that it would permit eleven jurors to return a verdict. As explained above, however, that error was harmless. To the extent that the dismissals of Alternate No. 2 and Juror No. 2 might be considered part of the violation of Rule 23(b), the error would still be harmless for the same reasons.

But the district court did not dismiss Alternate No. 2 and Juror No. 2 pursuant to a stipulation from the parties that "a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins." Fed. R. Crim. P. 23(b)(2)(B). Accordingly, the dismissals are properly evaluated under Rule 24(c)(1), which allows the district court "to replace any jurors who are unable to perform or who are disqualified from performing their duties." *Id*. 24(c)(1). The "district courts have 'broad discretion under Rule 24(c) to replace a juror at any time before the jury retires

22

if there is reasonable cause to do so, and a reviewing court will only find abuse of that discretion where there is bias or prejudice to the defendant.'" *United States v. Thompson*, 528 F.3d 110, 121 (2d Cir. 2008) (alteration omitted) (quoting *United States v. Purdy*, 144 F.3d 241, 247 (2d Cir. 1998)). "A juror may be discharged for misleading the court or when facts are presented which convince the court that a juror's ability to perform his duty has become impaired." *United States v. Floyd*, 496 F.2d 982, 990 (2d Cir. 1974).[9]

As we have explained, Johnson did not suffer prejudice from the absence of a twelfth juror. And, in any event, we conclude that the district court did not abuse its discretion in dismissing Alternate No. 2 and Juror No. 2. The three-hour delay that waiting for Alternate No. 2 would have occasioned provided reasonable cause for dismissal. Alternate No. 2 informed the district court that she had been "up all night" in the emergency room after her lips had swelled to "10 times" the normal size, App'x 170, and that she would not be able to reach the courthouse until "12:30 [pm] or so," *id*. at 189. It was not unreasonable for the district court to be concerned about the ability of

---

[9] We note that the "reasonable cause" standard under Rule 24(c)(1) does not differ significantly from the "good cause" standard under Rule 23(b), which "embraces all kinds of problems—temporary as well as those of long duration—that may befall a juror," *United States v. Reese*, 33 F.3d 166, 173 (2d Cir. 1994), and which "establishes no bright-line test for determining the length of juror unavailability that constitutes good cause for excusal," *United States v. Paulino*, 445 F.3d 211, 226 (2d Cir. 2006). "All that is needed to satisfy a prudent exercise of discretion is to be certain the trial court had sufficient information to make an informed decision." *Id.* (quoting *Reese*, 33 F.3d at 173). "The trial judge has substantial discretion under Rule 23(b) to remove a juror after deliberations have commenced where the judge has determined that the juror's ability to perform her duties has been impaired," including the ability "to deliberate as a fair and impartial juror." *United States v. Barone*, 114 F.3d 1284, 1307 (1st Cir. 1997).

23

Alternate No. 2 to perform her duties and to want to avoid delay. We have previously affirmed the dismissal of a juror who was ten minutes late to court because "we certainly cannot say that the judge abused his discretion by insisting on going ahead after 10 minutes." *United States v. Domenech*, 476 F.2d 1229, 1232 (2d Cir. 1973). We cannot say it here either.

Johnson argues that the dismissal was an abuse of discretion because it left only one alternate and because the district court was simultaneously considering whether to dismiss Juror No. 2. But "no law … requires, or even encourages, an appeals court to apply 20/20 hindsight to discretionary jury management decisions by district judges." *Paulino*, 445 F.3d at 226. We agree that the ultimate decision to proceed to verdict with eleven jurors was erroneous. Yet that does not mean that every prior decision which led to that point was necessarily erroneous as well.

The district court also did not abuse its discretion in dismissing Juror No. 2 after finding him to be "actively biased against the government" because "he attributed what he regards as a false or inaccurate accusation to the prosecution team." App'x 400-01. There is *good* cause—even under Rule 23(b)—to "dismiss jurors who, although available and physically capable of serving, are nonetheless found to be unable to perform their duties properly," and for that reason "Rule 23(b) dismissals have been upheld repeatedly in cases where the trial court found that a juror was no longer capable of rendering an impartial verdict." *United States v. Thomas*, 116 F.3d 606, 613 (2d Cir. 1997). Accordingly, there was surely reasonable cause under Rule 24(c)(1) to dismiss Juror No. 2 when his statements and answers to questioning revealed "that the juror in question would not be able to decide the matter objectively." *United States v. Torres*, 128 F.3d 38, 47 (2d Cir. 1997).

## III

Johnson further argues that the admission of Gutfeld's "Death threat" email as an excited utterance violated the hearsay rule and the Confrontation Clause. We again disagree.

## A

The excited utterance exception to the rule against hearsay allows the admission of an out-of-court "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).

An excited utterance is not synonymous with a present sense impression, however. "[W]hile the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement 'describe or explain' the contemporaneous event or condition, the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range of hearsay statements—*i.e.* those that 'relate to' the event." *United States v. Jones*, 299 F.3d 103, 112 n.3 (2d Cir. 2002) (citation omitted) (quoting Fed. R. Evid. 803(1), 803(2)). Therefore, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." *Tocco*, 135 F.3d at 127 (approving the admission of an excited utterance that occurred three hours after the startling event); *see also United States v. Scarpa*, 913 F.2d 993, 1017 (2d. Cir. 1990) (approving the admission of an excited utterance despite a "lapse of five or six hours" between the utterance and the startling event).

25

In this case, Johnson argues that the email lacked the "spontaneity" necessary to qualify as an excited utterance. Gutfeld sent the email—devoid of excited punctuation or language indicating that he was startled—several hours after Johnson sent him the Instagram messages. According to Johnson, "[t]here was no spontaneity in Gutfeld's email characterizing the message as a 'Death threat.'" Appellant's Br. 48.

Assuming that the email qualified as hearsay and required a hearsay exception, we conclude that the district court did not abuse its discretion by admitting the email as an excited utterance. The district court reasonably concluded that Gutfeld was still under the stress of the startling event when he wrote his email to corporate security personnel. Johnson sent the Instagram message at 5:30 am, when most people would be asleep—probably including Gutfeld, who as the district court noted "does an evening show." App'x 260. The district court found that Gutfeld would have seen the messages "materially later than 5 something in the morning," close in time to when he sent his email at 9:45 am. *Id.* That Gutfeld titled the email "Death threat" and forwarded it to security personnel suggests he took it seriously and was alarmed by it. That Gutfeld noted that the sender was located in Manhattan does not indicate that Gutfeld was no longer startled but more likely would have prompted greater alarm.

Even if the email had not been admitted as an excited utterance, however, its admission would have nonetheless been proper as evidence of the declarant's "then-existing state of mind … or emotional, sensory or physical condition." Fed. R. Evid. 803(3). As we have previously explained, "when a declaration is admitted only to prove a relevant state of mind, it does not appear to matter whether admissibility is predicated on the declaration not being hearsay or

26

under the Rule 803(3) hearsay exception for declaration of states of mind because under either theory, a state of mind can be proved circumstantially by statements which are not intended to assert the truth of the fact being proved." *United States v. Quinones*, 511 F.3d 289, 312 (2d. Cir. 2007) (alterations omitted) (quoting *United States v. Southland Corp.*, 760 F.2d 1366, 1376 (2d Cir. 1985)). The district court instructed the jury that the email was "in evidence solely for [the jury] to consider with respect to Mr. Gutfeld's state of mind when he received the Instagram post." App'x 263. The email was therefore evidence of the degree to which Gutfeld perceived the Instagram messages to be a serious threat, not whether the messages in fact were true threats or intended to be. It was not admitted for the truth of the matter it asserted. Given the two bases on which the email was properly admitted, the district court did not abuse its discretion by admitting it.

**B**

"In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. By guaranteeing that an accused has the right of confrontation, the Confrontation Clause of the Sixth Amendment "bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant has had a prior opportunity to cross-examine her.'" *Smith v. Arizona*, 144 S. Ct. 1785, 1791 (2024) (alteration omitted) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)).

"[T]wo limits" define the scope of this prohibition. *Id*. at 1792. First, "the Clause confines itself to 'testimonial statements,'" *id*. at 1792 (quoting *Davis v. Washington*, 547 U.S. 813, 823 (2006)), "or, put differently, the Confrontation Clause simply has no application to

27

nontestimonial statements," *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006). The Supreme Court has identified a "core class of 'testimonial' statements" that includes "*ex parte* in-court testimony or its functional equivalent"; "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Garlick v. Lee*, 1 F.4th 122, 129 (2d Cir. 2021) (quoting *Crawford*, 541 U.S. 51-52). Testimonial statements also include "statements 'made in the course of police interrogation'" when "the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution." *Smith*, 144 S. Ct. at 1792 (alteration omitted) (quoting *Davis*, 547 U.S. at 822). But "statements made to police 'to meet an ongoing emergency'" that "were 'not procured with a primary purpose of creating an out-of-court substitute for trial testimony'" are not testimonial. *Id.* (quoting *Michigan v. Bryant*, 562 U.S. 344, 358-59 (2011)). "The reliability of a testimonial statement may be determined only 'by testing in the crucible of cross-examination.'" *Garlick*, 1 F.4th at 129 (quoting *Crawford*, 541 U.S. at 61).

Second, the Confrontation Clause "bars only the introduction of hearsay—meaning, out-of-court statements offered 'to prove the truth of the matter asserted.'" *Smith*, 144 S. Ct. at 1792 (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). "When a statement is admitted for a reason unrelated to its truth … the Clause's 'role in protecting the right to cross-examination' is not implicated." *Id.* (quoting *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Johnson argues that the admission of Gutfeld's email violated the Confrontation Clause because the email included a testimonial

statement made by a non-testifying declarant. According to Johnson, when Gutfeld turned over the Instagram messages to Fox security personnel, he would have expected that government prosecutors would use the email as the functional equivalent of in-court testimony. We disagree. The admission of the email did not violate the Confrontation Clause because the email fell outside the "two limits" the Supreme Court has identified: it was neither testimonial nor hearsay. *Smith*, 144 S. Ct. at 1792.

First, the email was non-testimonial because it was not generated as part of a police interrogation, investigation, or any other process that aimed "to establish or prove past events potentially relevant to later criminal prosecution." *Smith*, 144 S. Ct. at 1792 (quoting *Davis*, 547 U.S. at 822). The email was even further removed from the class of testimonial statements than "statements made to police 'to meet an ongoing emergency'" that "were 'not procured with a primary purpose of creating an out-of-court substitute for trial testimony,'" *id.* (quoting *Bryant*, 562 U.S. at 358-59), because Gutfeld did not even communicate with law enforcement. Rather, he alerted his company's internal personnel about a possible threat with the purpose of addressing his immediate security concern rather than establishing past events.

Second, as the district court instructed the jury, the email was admitted "solely for [the jury] to consider with respect to Mr. Gutfeld's state of mind when he received the Instagram post." App'x 263. It was therefore admitted not for the truth of the matter asserted but to establish "a state of mind," which "can be proved circumstantially by statements which are not intended to assert the truth of the fact being proved." *Quinones*, 511 F.3d at 312 (quoting *Southland Corp.*, 760 F.2d at 1376). Under these circumstances, the

29

admission did not violate the Confrontation Clause. *See Smith*, 144 S. Ct. at 1792.

**IV**

Johnson argues that the district court erred when it delivered an uncalled witness charge, instructing the jury that the absence of witnesses "should not affect your judgment one way or another." App'x 514. Johnson claims that the instruction "severely prejudiced the defense" because it "undermined the valid defense argument that the subjects' failure to testify demonstrated that they did not take the threats seriously." Appellant's Br. 53. We conclude that the instruction was not erroneous.

When a particular witness is equally available to both sides but neither party calls the witness, "the court has discretion to (1) give no instruction and leave the entire subject to summations, (2) instruct the jury that no unfavorable inference may be drawn against either side, or (3) instruct the jury that an adverse inference may be drawn against either or both sides." *United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997) (citations omitted). In this case, the district court chose the second option. One leading commentary explains that this "option, charging that no inference should be drawn against either party, is recommended" and that "courts are in general agreement concerning the acceptability of … instructing the jury to draw no inferences against either party." 1 Modern Federal Jury Instructions—Criminal ¶ 6.04 (2024). Such an "instruction is preferred because it removes the issue from consideration of the jury, avoiding the possibility that the jury will draw inappropriate inferences from the absence of the

witness." *Id.*[10] Overall, "[t]he decision whether to give a missing witness instruction is within the discretion of the trial court." *United States v. Adeniji*, 31 F.3d 58, 65 (2d Cir. 1994).

The district court did not abuse that discretion here. Johnson argues that the instruction prevented the jury from considering the defense's "valid point that the failure of any of the subjects" of the alleged threats "to testify showed that they did not take these videos seriously." Appellant's Br. 54-55. But Johnson does not dispute that "both sides had an equal opportunity or lack of opportunity to call" the subjects "as witnesses." App'x 514. Had Johnson wanted to show that the subjects did not take the threats seriously, the defense could have subpoenaed Gutfeld, Ingraham, Manchin, or Boebert. Having chosen not to do so, the defense could not argue to the jury that the government's decision to make the same choice as the defense serves as evidence of what the witnesses would have said.

Johnson points to a statement in the opinion in *Caccia*—describing the prior opinion in *Adeniji*—to the effect that "we have suggested that where a witness is equally available to both sides, a missing witness charge is 'inappropriate.'" *Caccia*, 122 F.3d at 139 (quoting *Adeniji*, 31 F.3d at 65); Appellant's Br. 54. But neither *Adeniji* nor *Caccia* help Johnson. In *Adeniji*, the defendant argued that "the district court committed plain error in *failing* to give a missing witness

---

[10] *But see* 2 John Henry Wigmore, *Evidence* § 288(c), at 208 (Chadbourn rev. 1979) (arguing that "the more logical view is that the failure to produce is *open* to an inference *against both parties*, the particular strength of the inference against either depending on the circumstances"). We have said that when "the district court instructs the jury that the defendant is not compelled to produce any witnesses, there may be some question as to which of the two alternative charges would be the more logical." *United States v. Bahna*, 68 F.3d 19, 22 (2d Cir. 1995).

31

charge regarding the unnamed agent who purportedly questioned him about the jackets." *Adeniji*, 31 F.3d at 65 (emphasis added). The defendant thought the jury should have been instructed that an adverse inference could be drawn against the government for failing to call the agent because "[i]t is well settled that when a party has it peculiarly within its power to produce witnesses and fails to do so, the jury may infer that the testimony, if produced, would be unfavorable to that party." *Id.* (quoting *United States v. Myerson*, 18 F.3d 153, 158 (2d Cir. 1994)). We said that "[w]here the witness is equally available to both parties, an instruction on this inference"— that is, an *adverse* inference—"is inappropriate." *Id.* Because "Adeniji [had] not shown that the missing agent was unavailable to him," he could not establish that the district court erred in not affirmatively authorizing an adverse inference against the government. *Id.*

Our decision in *Caccia* similarly concerned an "instruction *permitting* an inference against either or both parties." *Caccia*, 122 F.3d at 139 (emphasis added). We said that such an instruction was "especially inappropriate because of the circumstances countering the equal availability of the witness." *Id.* The missing witness had assisted the government as an informant "and had expressed unwillingness to speak to defense counsel before trial." *Id.* We said that while "the witness, having ended a relationship with the Government two years previously, was not so peculiarly within the Government's control as to *require* the defendant's requested instruction" authorizing an adverse inference against the government, "the trial judge would have been well advised either to refrain from giving an 'equal availability' instruction or to instruct that no inference should be drawn." *Id.* We concluded that the district court's instruction permitting an inference against either party was not prejudicial, but

32

our statement that a "no inference" instruction would have been preferable undermines Johnson's argument here.

In fact, in *United States v. Dawkins*, we specifically rejected a challenge to a jury instruction almost identical to the jury instruction in this case.[11] The defendants in *Dawkins* requested an adverse inference instruction against the government because "one of the Government's key witnesses, undercover agent D'Angelo, was unavailable to them." *Dawkins*, 999 F.3d at 796. But the district court explained that "if the defendants had wanted to call D'Angelo to testify about his meetings with the defendants, or for some other permissible purpose, they clearly could have done so." *Id*. at 797. We concluded that the case "falls within the situation we described in *United States v. Caccia*: 'where a witness is equally available to both sides, but is not called by either side[,] the court has discretion'" to

---

[11] *Compare United States v. Dawkins*, 999 F.3d 767, 796 (2d Cir. 2021) ("There are several persons whose names you may have heard during the course of the trial but did not appear to testify. I instruct you that each party has an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way. You should, however, remember my instruction that the law does not impose on a defendant in a criminal case, the burden or duty of calling any witness or producing any testimony."), *with* App'x 514 ("Now, there are a number of people whose names you've heard during the course of the trial who did not come here and testify. I instruct you that both sides had an equal opportunity or lack of opportunity to call those people as witnesses. Therefore, you should not draw any inference or reach any conclusions as to what they would have said had they been called. Their absence should not affect your judgment one way or the other. You should, however, remember my instruction that the defendant is not obliged in a criminal case to call any witnesses or produce any evidence.").

give one of the three possible instructions, and "[t]he district court's choice of the second option fell within its broad discretion." *Id.* (alteration omitted) (quoting *Caccia*, 122 F.3d at 139).

In this case, Johnson "clearly could have" called the subjects of his threats to testify. *Id.* Having made the same choice as the government not to do so, he cannot claim that an inference should point only in one direction or fault the district court for seeking to "avoid[] the possibility that the jury will draw inappropriate inferences from the absence of the witnesses." 1 Modern Federal Jury Instructions—Criminal, *supra*, ¶ 6.04. Under these circumstances, the district court was "well advised … to instruct that no inference should be drawn." *Caccia*, 122 F.3d at 139.

**V**

Finally, Johnson argues that the district court erred in admitting the testimony of Kelley regarding the seriousness of Johnson's threats. According to Johnson, the testimony was impermissible expert opinion under Federal Rule of Evidence 701 and usurped the role of the jury. Appellant's Br. 56-58. We disagree.

"We review a district court's evidentiary rulings under 'a deferential abuse of discretion standard' and will disturb its rulings 'only where the decision to admit or exclude evidence was manifestly erroneous,'" *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021) (quoting *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015)), and "only if [the] error affects a 'substantial right'" in that it "had a 'substantial and injurious effect or influence' on the jury's verdict," *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (quoting *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003)).

Rule 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited" to an opinion

34

that is "(a) rationally based on the witness's perception," "(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Because such an opinion is not expert but "lay opinion," it must reflect "reasoning processes familiar to the average person in everyday life." *Garcia*, 413 F.3d at 215. The "helpfulness requirement is principally designed to provide assurance against the admission of opinions which would merely tell the jury what result to reach." *United States v. Flores*, 945 F.3d 687, 706 (2d Cir. 2019) (internal quotation marks and alteration omitted).

Johnson suggests that Kelley's testimony about the nature of the threats amounted to impermissible expert testimony because his "reasoning process was not that of an average person in everyday life" but reflected "specialized knowledge." *United States v. Cabrera*, 13 F.4th 140, 150 (2d Cir. 2021); Appellant's Br. 62-64. Johnson also contends that Kelley's testimony "usurped the function of the jury to decide what to infer" from the evidence. *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004); Appellant's Br. 64-66.

Kelley testified about the events that followed the NYPD alerting him to the threatening messages and videos that Johnson posted. Kelley testified that he contacted Representative Boebert's chief of staff at 11:30 pm on February 4, 2021, because of "the type of threat" he witnessed in the videos. App'x 114. Kelley thought that the language "was concerning enough" that he "felt that it was necessary to make sure that the office and the member of Congress was properly notified." *Id.* When asked to explain how he formulated that opinion, he testified that he was concerned about three elements of the threats: (1) that Johnson had said "I'm going to kill you," phrasing that was more "intens[e]" than "we are going to kill you" or "I hope you die,"

35

*id.* at 116-17; (2) that Johnson repeated the threat "over and over again" throughout the video, *id.* at 117; and (3) that Johnson had "tagged" Boebert's account in the video, *id*.

With regard to the threats against Manchin, Kelley testified that he ordered directed patrols at Manchin's home because of "the concerning nature and threatening aspect of [Johnson's] comments." *Id.* at 201. On redirect, Kelley testified that he called Manchin's chief of staff because he was concerned by the "intensity of the language," the "repetition of the statements," and the content of the caption in the post. *Id.* at 244-45.

We conclude that the district court did not err in admitting Kelley's testimony. First, Kelley's "specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'" *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (quoting *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004)). Kelley's testimony was properly based on his investigation rather than exclusively on his expertise. Second, because Kelley's testimony "resulted from a process of reasoning familiar in everyday life, it was permissible lay opinion testimony under Rule 701." *Rigas*, 490 F.3d at 224 (internal quotation marks and alteration omitted). Kelley's testimony that he was concerned by such things as the "intensity of the language" and the "repetition of the statements," App'x 244-45, hardly reflects the sort of "opaque, intuitive process grounded in some kind of specialized knowledge" that characterizes expert testimony, *Cabrera*, 13 F.4th at 150.

36

In *Cabrera*, by contrast, the testifying agent reached an inference "well beyond" what a lay person could have inferred. *Id.* In particular, the agent "inferred from Cabrera's driving that Cabrera must be one of those experienced drug-dealers who had mastered the technique of evading law enforcement." *Id*. We said that "[a] lay person [would be] unfamiliar with law enforcement surveillance techniques and incapable of inferring that a suspect's driving maneuvers evince (1) experience with evading those techniques and, consequently, (2) experience dealing drugs." *Id.* To the contrary, a lay "juror might as easily ascribe those maneuvers to watching the movies, or to a paranoia born of inexperience." *Id.* Kelley's testimony was not "based on specialized experience that the agent had accumulated from other cases" nor did it involve "a specialized reasoning process not readily understandable to the average juror." *United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013). Because Kelley's "reasoning was evident to the jury," it was not impermissible expert testimony. *Id.*

Additionally, we have said that it may be appropriate to introduce testimony "to explain the investigation, or to show an agent's state of mind so that the jury will understand the reasons for the agent's subsequent actions," and that such testimony may "constitute appropriate rebuttal to initiatives launched by the defendant." *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994). In this case, the defense argued to the jury in its opening statement that Fox Corporation did not respond in the same way to all threats but singled out Johnson for his political views. The defense "implore[d]" the jury "to ponder why that is." App'x 99. "Why does Fox News, why did they choose to pursue Mr. Johnson, but not others?" *Id.* The argument suggested that law enforcement had an improper motivation in targeting Johnson, given "the constant barrage of criticism and threats from the public," *id*. at 99-100, including from Fox Corporation, which

37

alerted law enforcement in the first place. This argument focused on the motivation of law enforcement in responding to Johnson's threats. After the defense put that motivation at issue, it was proper for the district court to allow the government to elicit testimony from Kelley about why he responded to Johnson's threats the way that he did.

Johnson nevertheless contends that Kelley's testimony "'usurped the function of the jury to decide what to infer from the content' of [Johnson's] statements and simply told the jurors what to infer." Appellant's Br. 65 (quoting *Grinage*, 390 F.3d at 750). In *Grinage*, a law enforcement agent "interpreted both the calls that the jury heard and the calls that the jury did not hear," applying specialized expertise not only to decode the slang used in the calls but also to infer from the calls the extent to which the participants must have been involved in a drug conspiracy. *Grinage*, 390 F.3d at 750. Kelley's testimony, by contrast, "reflected his investigatory findings and conclusions" and was otherwise based on "a process of reasoning familiar to everyday life." *Rigas*, 490 F.3d at 224. His testimony did not "provid[e] an overall conclusion of criminal conduct" that usurped the jury's function. *United States v. Zhong*, 26 F.4th 536, 556 (2d Cir. 2022) (quoting *Dukagjini*, 326 F.3d at 54).

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.

CHIN, *Circuit Judge*, dissenting:

In this case, defendant-appellant Rickey Johnson was convicted on three counts of a four-count superseding indictment -- by an eleven-person jury. After discharging the twelfth juror (no alternates were available), the district court proceeded with only eleven jurors. A district court, however, has discretion to permit an eleven-person jury in a criminal case *only* upon the parties' written stipulation *or* for good cause "[a]fter the jury has retired to deliberate." Fed. R. Crim. P. 23(b)(3). Here, the district court did not have the consent of the parties and the jury had not yet retired to deliberate. Hence, the district court did not have authority to permit a jury of eleven persons to return a verdict, and it erred in permitting an eleven-person jury to do so here.[1]

On appeal, Johnson argues that the district court's violation of Rule 23(b) requires vacatur of his convictions without a consideration of prejudice

---

[1] Rule 23(b)(2) provides that "[a]t any time before the verdict, the parties may, with the court's approval, stipulate in writing" to a jury of "fewer than 12 persons." The parties may stipulate to fewer than twelve persons outright or to fewer than twelve persons "if the court finds it necessary to excuse a juror for good cause after the trial begins." Fed. R. Crim. P. 23(b)(2)(A), (B). Rule 23(b)(3) provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." The provision permitting an eleven-person jury was added when Rule 23 was amended in 1983. *See generally United States v. Stratton*, 779 F.2d 820, 831 (2d Cir. 1985).

because the error is structural. Alternatively, Johnson argues that, even assuming the error is not structural, the government has failed to show that the error was harmless. The majority affirms, concluding that, while the district court did err in proceeding with an eleven-person jury in the circumstances here, the error was not structural and, moreover, the error was harmless.

In my view, the error was structural. Even assuming a defendant does not have a constitutional right to a twelve-person jury, the Federal Rules of Criminal Procedure give a defendant that right in a federal criminal case, a right that can be circumscribed only in the limited circumstances specified in Rule 23(b). The requirement of a twelve-person jury rendering a unanimous verdict is part of the fundamental framework within which a federal criminal trial operates, and has been a critical aspect of our criminal justice system for hundreds of years.

Even assuming the error is not structural, the government has not met its burden of showing that the error did not prejudice Johnson. *See United States v. Vonn*, 535 U.S. 55, 62 (2002) (where a defendant timely objects to error and harmless error review pursuant to Rule 52(a) applies, the government bears "the burden of showing that any error was harmless, as having no effect on the

2

defendant's substantial rights"); *United States v. Blaszczak*, 56 F.4th 230, 245 (2d Cir. 2022) ("In harmless-error analysis, the government bears the burden of proof."). I cannot say with any assurance, let alone "fair assurance," that the jury's "judgment was not substantially swayed by the error," and in my view "it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

Accordingly, I respectfully dissent.[2]

## I.

On February 3, 2021, while watching television alone at home, Johnson made eight videos, recording himself ranting as Fox News television hosts Greg Gutfeld and Laura Ingraham, Senator Joe Manchin, and Congresswoman Lauren Boebert each appeared on the screen. He made statements to the effect that he was going to kill them. He posted the videos to his Instagram account. Gutfeld and Boebert were the subjects of one video each, Manchin was the subject of two videos, and the remaining four videos pertained to Ingraham. Johnson also sent a written message to Gutfeld on January 30, 2021,

---

[2] In affirming, the majority rejects Johnson's other challenges to his conviction. *See* Majority Op. at 2. Because, in my view, the violation of Rule 23(b) alone requires vacatur, I do not address the other grounds raised by Johnson on appeal.

3

through Instagram, stating that Gutfeld "will be killed." App'x at 565. For this conduct, the Superseding Indictment charged Johnson with two counts of transmitting threatening communications in interstate commerce in violation of 18 U.S.C. § 875 and two counts of threatening a United States official in violation of 18 U.S.C. §§ 115(a)(1)(B) and (b)(4). Counts One and Four charged Johnson with making threats against Gutfeld and Ingraham, respectively. Counts Two and Three charged Johnson with making threats against Senator Manchin and Representative Boebert, respectively.

All four counts of the Superseding Indictment required the government to prove beyond a reasonable doubt that Johnson's statements were "true threats" -- that is, "serious statement[s] expressing an intention to inflict bodily injury or to kill at once or in the future . . . [and] made in such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to inflict bodily injury or to kill." App'x at 498. This element of the charged offenses was the key issue in dispute at trial.

Johnson's trial, from *voir dire* to verdict, spanned five days. Trial commenced on Wednesday, February 16, 2022. Twelve jurors and two alternates

4

were selected in the morning, and the government began presenting its case in the afternoon. The next morning, Thursday, February 17, despite some delays because of issues with two jurors (one, an alternate, was excused and one -- Juror no. 2 -- was questioned but kept on the jury), the government completed its case and it rested by the afternoon. The defense called its one and only witness that afternoon as well. Proceedings were then adjourned until Tuesday, February 22, because of Presidents' Day Weekend.

When trial resumed on Tuesday, on consent of the parties, the district court excused Juror no. 7 and replaced him with the one remaining alternate. The trial court then decided, over Johnson's objection, to excuse Juror no. 2 based on its finding that the juror was "actively biased against the government." *Id.* at 401. The district court decided to proceed with eleven jurors over Johnson's objection, concluding that it was permitted to do so under "Rule 24." *Id.*[3]

The defense did not present any further evidence and rested. Counsel delivered their summations; the court charged the jury; and the eleven-

---

[3]    The district court was mistaken in citing Rule 24, and the lawyers did not correct the error. Rule 24 covers *voir dire*, peremptory challenges, and alternate jurors, and it does not address the number of jurors required to render a verdict. *See* Fed. R. Crim. P. 24.

5

member jury began its deliberations at 3:09 p.m. The jury was sent home at 5:25 p.m. The jury continued its deliberations the next day, Wednesday, February 23. At one point, the jury sent out a note asking, in part: "Can we consider the defendant not guilty by virtue of mental illness? Do we have to convict even if we think he is mentally ill?" App'x at 530-31. At 4:45 p.m., the jury sent out another note, stating: "At this time we have not reached a consensus on one of the counts. We do not believe we will reach a consensus. How do we proceed[?]" *Id*. at 540. The court denied Johnson's request for a mistrial as to the one count, and gave the jury the option of continuing to deliberate without returning a partial verdict as to the counts it agreed on or returning a partial verdict on those counts and then continuing to deliberate on the final count.

At 5:40 p.m., the jury sent another note indicating it had reached a verdict. The jury returned a partial verdict, finding Johnson guilty of Counts One, Two, and Four. As the jury was being polled, the foreperson asked if he could say something, and then advised the court that "[w]e do not believe we will be able to reach a consensus on Count Three." *Id*. at 545. The district court instructed the jury nonetheless to return the next day. The jury indeed returned

6

the next morning, Thursday, February 24, and continued its deliberations. At 5:08 p.m., it returned a verdict on Count Three, finding Johnson not guilty.

Accordingly, although the trial spanned five days, the presentation of evidence took only one day, while the jury deliberations took more than two full days.

## II.

The first issue is whether Johnson is entitled to relief without regard to prejudice. Most errors that are preserved at trial -- including many constitutional errors -- are reviewed for harmlessness. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *see also Arizona v. Fulminante*, 499 U.S. 279, 306 (1991) ("Since this Court's landmark decision in *Chapman v. California*, 386 U.S. 18 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless." (collecting cases)). The "common thread connecting" cases where harmless-error review has been applied "is that each involved 'trial error' -- error which occurred during the presentation of the case

7

to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307-08.

The Supreme Court has "recognized, however, that some errors should not be deemed harmless beyond a reasonable doubt. These errors came to be known as structural errors." *Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017) (citation omitted). The "defining feature of a structural error," *id.* at 295, is that it "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself," *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Fulminante*, 499 U.S. at 310).

In *Weaver*, the Supreme Court identified "at least three broad rationales" for why a particular error is not amenable to harmless error review, and is therefore deemed structural. 582 U.S. at 295. An error "has been deemed structural" if (1) "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as "the defendant's right to conduct his own defense" or the defendant's right to a public trial; (2) "the effects of the error are simply too hard to measure," such as "when a defendant is denied the right to select his or her own attorney"; and (3) "the error

8

always results in fundamental unfairness," such as "if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction." *Id.* at 295-96, 299 (citations omitted). "In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural." *Id.* at 296.

The first question is thus whether the district court's error in excusing the twelfth juror prior to deliberations with no alternates available and without Johnson's consent is a structural error that requires automatic reversal.

## A.

Pursuant to Rule 23(b), Johnson "was entitled to be tried by a twelve-person jury, and the district court possessed no discretion -- prior to deliberations -- to conduct the trial with an eleven-member jury, absent [Johnson's] consent." *United States v. Curbelo*, 343 F.3d 273, 278 (4th Cir. 2003). In my view, the district court's failure to comply with Rule 23(b) is a structural error requiring automatic reversal of Johnson's convictions.

The error here falls squarely within *Weaver*'s second rationale for deeming an error structural: the repercussions of this error "are simply too hard to measure," *Weaver*, 582 U.S. at 295, and "are necessarily unquantifiable and

9

indeterminate," *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993). Simply put, an appellate court cannot predict with any degree of certainty how an unidentified twelfth juror, with his or her varied life experiences and personal beliefs, would have viewed the evidence presented against Johnson and participated in deliberations with eleven individuals from different walks of life. *Cf. United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (holding that the erroneous deprivation of the right to counsel of choice is structural because "[i]t is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings," and thus, "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe").

Because an appellate court cannot know what effect a twelfth juror might have had on jury deliberations, making such a determination would be based, inherently, on pure speculation. But convictions cannot, and should not, be affirmed based on a reviewing court's speculation. *See Sullivan*, 508 U.S. at 280 ("The Sixth Amendment requires more than appellate speculation about a

hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.").

Moreover, unlike the quintessential "trial error" that is subject to harmless-error review -- the erroneous admission of evidence -- this Court cannot assess the effects of depriving Johnson of a twelve-juror verdict "in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 308. Given the safeguards preventing disclosure of what goes on in the jury room, there is no "context" when it comes to a jury's deliberative process. *See United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997) ("As a general rule, no one -- including the judge presiding at a trial -- has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror. The secrecy of deliberations is the cornerstone of the modern Anglo-American jury system."). Under these circumstances, it is impossible for this Court to determine, as would be required if reviewing for harmless error, "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the [Rule 23(b)] error." *Sullivan*, 508 U.S. at 279 (emphasis in original); *see also United States v. Essex*, 734 F.2d 832, 845 (D.C. Cir. 1984) ("In cases involving secret jury

11

deliberations it is virtually impossible for a defendant to demonstrate actual prejudice. . . . We believe that prejudice is *inherent* when a court permits a jury of 12 to continue deliberations and return a verdict with only 11 jurors, without making the finding required by the Rule and the stipulation.") (emphasis in original).

Even assuming that the eleven jurors all would have voted the same way if there had been a twelfth juror, the twelfth juror could, nonetheless, have caused a hung jury by choosing not to abandon her own convictions or assessment of the evidence. Of course, it is also possible that a twelfth juror could have persuaded one or more of the other jurors to reach a different outcome. By suggesting that the verdict in this case would been the same had the district court's Rule 23(b) error not been made, the majority ignores the always-possible outcome of a hung jury, which any juror, acting alone, can cause to transpire.[4]

---

[4] The majority writes that "[h]ad the district court waited a few hours -- and dismissed the twelfth juror for cause after the jury had 'retired to deliberate' -- the district court would not have violated Rule 23(b)." Majority Op. at 17 (citing Fed. R. Crim. P. 23(b)(3)). In that scenario, the district court would have indeed followed Rule 23(b). But the point is that the district court did *not* follow the Rule and erred when it dismissed the twelfth juror prior to deliberations without Johnson's consent. Accordingly, what the majority casts as a "small change in timing" was, in my view, an obvious error with a prejudicial effect on Johnson.

Moreover, decisions of our sister circuits have held that proceeding with an eleven-member jury without a defendant's consent prior to deliberations is a structural error. The Fourth Circuit addressed the exact Rule 23(b) violation at issue here and held that "[i]t is this sort of error . . . that is inherently prejudicial and *per se* reversible." *Curbelo*, 343 F.3d at 285; *see also id.* ("The Rule 23(b) error in [defendant's] trial tainted the process by which guilt was determined, and it therefore inherently casts doubt on the reliability of the jury's verdict."). Other circuits have considered other kinds of Rule 23(b) violations -- such as proceeding with a jury of less than twelve pursuant to an oral stipulation from the parties, *see, e.g.*, *United States v. Taylor*, 498 F.2d 390, 392 (6th Cir. 1974), or dismissing the twelfth juror without cause after deliberations had begun, *see, e.g.*, *Essex*, 734 F.2d at 845 -- and held that such violations also require reversal without engaging in harmless-error review, *see Curbelo*, 343 F.3d at 283-85 (collecting cases).

For these reasons, the district court's Rule 23(b) error is structural.

**B.**

The majority holds that the district court's Rule 23(b) error is not structural because "the right to a twelve-member jury is neither a constitutional

13

nor even a substantial right." Majority Op. at 14. Although the Supreme Court initially interpreted the Sixth Amendment to preserve the right to be tried by "a jury constituted, as it was at common law, of twelve persons," *Thompson v. Utah*, 170 U.S. 343, 349 (1898), the Court more recently held that the Sixth Amendment, as applied to the states through the Fourteenth Amendment, does not require twelve jurors for conviction, *see Williams v. Florida*, 399 U.S. 78, 102 (1970) ("[T]he fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.'" (citation omitted)). In my view, however, *Williams* does not foreclose the conclusion that the error here is structural.

The Supreme Court has never held that an error is structural *only* if it affects a defendant's constitutional rights. Despite occasionally suggesting in dicta that structural errors implicate constitutional rights, *see, e.g., Neder*, 527 U.S. at 7 ("[W]e have recognized a limited class of fundamental constitutional errors that defy analysis by 'harmless error' standards." (citation and internal quotation marks omitted)), the Supreme Court has never explicitly held that errors *must* affect a defendant's constitutional rights to qualify as structural error, *see Curbelo*,

14

343 F.3d at 280 n.6 (collecting cases). The observation that not every constitutional error qualifies as structural error does not mean that only errors premised on a constitutional deprivation can so qualify. *See, e.g.*, *Sullivan*, 508 U.S. at 278 ("[W]e [have] rejected the view that all federal constitutional errors in the course of a criminal trial require reversal."); *Rose v. Clark*, 478 U.S. 570, 577 (1986) (noting that the Supreme Court has "recognized that some constitutional errors require reversal without regard to the evidence in the particular case").

Moreover, *Williams* involved state criminal proceedings and a Florida statute that permitted six-person juries in non-capital criminal cases. 399 U.S. at 79-80. The Court's holding that a defendant does not have a Sixth Amendment right to a twelve-person jury in a state criminal case where state law provides for less than a twelve-person jury does not mean that a defendant in a federal criminal case does not have a substantial right to a twelve-person jury under the Federal Rules of Criminal Procedure and the long-standing tradition of a twelve-person jury in federal criminal practice.

Likewise, the Second Circuit has not held that structural errors *must* be of constitutional dimension. Rather, we have recognized that "[c]ategories of error found by the Supreme Court to be 'structural' *ordinarily* relate to 'certain

15

basic, constitutional guarantees that should define the framework of any criminal trial.'" *Shabazz v. United States*, 923 F.3d 82, 84 (2d Cir. 2019) (emphasis added) (quoting *Weaver*, 582 U.S. at 295); *see also United States v. Moran-Toala*, 726 F.3d 334, 343 (2d Cir. 2013) ("Courts have recognized a limited number of structural errors, all involving the violation of bedrock constitutional rights, such as total deprivation of the right to counsel, exclusion of jurors on the basis of race,; and improper closure of a courtroom to the public." (citations omitted)). But there is no case in this Circuit where we have deemed an error to be non-structural solely because the error was not premised on the deprivation of a constitutional right. *But see United States v. Gonzalez-Huerta*, 403 F.3d 727, 734 (10th Cir. 2005) ("[G]enerally speaking structural errors must, at a minimum, be constitutional errors."); *United States v. Stevens*, 223 F.3d 239, 244 (3d Cir. 2000) (stating that a non-constitutional error "generally cannot amount to a structural defect").

As the majority points out, our Court has observed that "*Williams* suggests that the absolute right to a jury of twelve . . . is no longer viewed as a 'substantial right' by the Supreme Court." *Stratton*, 779 F.2d at 834. We made that observation, however, in the context of deciding whether the 1983 amendment to Rule 23(b) could be applied retroactively, without violating the *Ex*

16

*Post Facto* clause. *See id*. at 835 (reducing the jury size from twelve to eleven "does not affect the substantial rights of the defendant *for Ex Post Facto purposes*") (emphasis added). The district court elected to proceed with an eleven-person jury *after* deliberations had already commenced when a juror was excused on the second day of deliberations. *Id*. at 830-31. We held that the retroactive application of the amendment did not violate the *Ex Post Facto* clause. *Id*. at 834. *Stratton* did not hold that the right to a twelve-person jury was not a substantial right for other purposes.

## C.

The right to a twelve-person jury is, in my view, a substantial right in the context of a federal criminal trial. Even though the Supreme Court held in *Williams* that the Sixth Amendment, as applied to the states through the Fourteenth Amendment, does not require twelve jurors for conviction, "the jury right embodied in Rule 23(b) unquestionably has constitutional dimensions." *Curbelo*, 343 F.3d at 278-79; *accord Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) (holding that the Sixth and Fourteenth Amendments require a unanimous jury verdict for serious offenses in state and federal courts). Rule 23 "is a formulation of the constitutional guaranty of trial by jury." Fed. R. Crim. P. 23, Notes of

Advisory Committee subd. (a).  Indeed, two provisions of the Constitution relate specifically to the right to trial by jury.  *See* Art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury."); U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.").

At common law, at the time of the Sixth Amendment's adoption, and until recent history, the right to trial by jury for serious criminal offenses meant a trial before twelve jurors, no more no less.  "[T]he general infrastructure of the criminal jury as a twelve-member body rendering unanimous verdicts was clearly established by" the late 14th century in England.  Robert H. Miller, Comment, *Six of One is Not a Dozen of the Other:  A Reexamination of* Williams v. Florida *and the Size of State Criminal Juries*, 146 U. Pa. L. Rev. 621, 638-39 (1998); *see also Ramos*, 590 U.S. at 90 (noting that one late 14th century English decision stated that a "'verdict, taken from eleven, was no verdict' at all" (quoting James Bradley Thayer, A Preliminary Treatise On Evidence At The Common Law 89 n.4 (1898)).  In 1769, Blackstone reiterated the common-law rule --  no person could be found guilty of a serious crime unless "the truth of every accusation . . .

18

should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen." William Blackstone, 4 Commentaries on the Laws of England 343, 552 (1769). This same common-law rule applied in the young American colonies, *see, e.g.*, *IV. Unshrinking the Federal Civil Jury*, 110 Harv. L. Rev. 1466, 1468 (1997) ("In the American colonies, the Charter of Jamestown established the twelve-person jury in 1607."), and well after the Sixth Amendment's adoption, *see, e.g.*, Joseph Story, 2 Commentaries on the Constitution of the United States 588 (1858) ("And a trial by jury is generally understood to mean, *ex vi termini*, a trial by a jury of *twelve* men, impartially selected, who must *unanimously* concur in the guilt of the accused before a legal conviction can be had. Any law therefore, dispensing with any of these requisites, may be considered unconstitutional."); *Foote v. Lawrence*, 1 Stew. 483, 483 (Ala. 1828) ("The term *jury* is well understood to be twelve men . . . .") (emphasis in original); *Work v. State*, 2 Ohio St. 296, 304 (1853) ("The number must be twelve . . . ."); *Cancemi v. New York*, 18 N.Y. 128, 138 (1858) ("It would be a highly dangerous innovation, in reference to criminal cases, . . . for the court to allow any number short of a full panel of twelve jurors, and we think it ought not to be tolerated."); *Thompson*, 170 U.S. at 349.

The majority's holding that a defendant's right pursuant to Rule 23(b) to a twelve-member jury is not a substantial right eviscerates Rule 23(b). The majority's holding that violations of Rule 23(b) are not structural injects a requirement of prejudice, when the rule by its terms imposes no such condition. It means that trial judges can proceed with fewer than twelve jurors as long as they believe the evidence is strong. Such a broad holding strips Rule 23(b) of its intended effect -- to ensure that federal criminal cases are decided by jurors of twelve, except in certain limited and prescribed circumstances.

An additional consideration is the length of the trial. The exception to the requirement of a twelve-person jury was adopted for a specific reason: to address the "dilemma" posed by cases where jurors became incapacitated during jury deliberations in long trials. *See Stratton*, 779 F.2d at 831 (citing *United States v. Meinster*, 484 F. Supp. 442 (S.D. Fla. 1980) (juror had heart attack during deliberations after six months of trial), and *United States v. Barone*, 83 F.R.D. 565 (S.D. Fla. 1979) (juror became incapacitated during jury deliberations after six months of trial)). Indeed, the Advisory Committee Notes to the 1983 amendments observed as follows:

> *If the trial has been brief and not much would be lost by retrial*, the court might well conclude that the *unusual* step of allowing a jury verdict

20

by less than 12 jurors absent stipulation should not be taken. On the other hand, if the trial has been protracted the court is much more likely to opt for continuing with the remaining 11 jurors.

Fed. R. Crim. P. 23, Advisory Committee Notes to 1983 Amendments (emphasis added). The Advisory Committee recognized that permitting a verdict by only eleven jurors was an "unusual" step not to be taken lightly.

Here, of course, the trial was indeed brief. This was essentially a two-day trial, and the government presented its entire case in the equivalent of one full day. It would not have been a significant burden for the case to be retried.

Notwithstanding *Williams*, a defendant's right to a twelve-person jury is a substantial right, and the district court's Rule 23(b) error in this case is in my view structural. Johnson is entitled to a new trial, without regard to the issue of prejudice.

**III.**

Even if I were to conclude that the district court's violation of Rule 23(b) did not constitute structural error and therefore was subject to harmless-error review, I would nonetheless vacate Johnson's conviction because the

21

government has failed to meet its burden of demonstrating that the error was harmless.

Pursuant to Federal Rule of Criminal Procedure 52(a), harmless-error review considers whether the error has "affect[ed] substantial rights." *See* Fed. R. Crim. P. 52(a). When the defendant has made a timely objection to an error and Rule 52(a) applies, the government bears the burden of demonstrating that the error did not prejudice the defendant. *See United States v. Olano*, 507 U.S. 725, 734-35 (1993). In determining whether the government has met this burden, "we ask whether we can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Gupta*, 747 F.3d 111, 133 (2d Cir. 2014) (citation and quotation marks omitted). "The inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos*, 328 U.S. at 765.

The majority rejects Johnson's contention that "the case was close." Majority Op. at 20. It further contends that "[t]he conduct of the jury did not

indicate that there was significant disagreement over Counts One, Two, and Four." *Id*. at 20. I disagree.

While it is impossible to know with any certainty what actually happened during the deliberations, there are several indications that this was in fact a close case. First, there was a split verdict -- although the four counts were similar in nature and the government presented nearly identical evidence on each count, the jury convicted on three counts and acquitted on one count. Second, although the presentation of evidence took only the equivalent of one day, the jury took more than two days to return a full verdict -- it deliberated for more than two hours the first day and until after 5 p.m. on both the second and third days. Even with respect to the three counts of conviction, the jury took more than a day to reach a verdict. Third, the jury sent out notes suggesting that it was having some difficulty -- one inquiring about mental illness and another indicating that it could not reach a consensus on one count. Fourth, the foreperson reiterated in open court that the jury did not believe it could reach a consensus on one count. These are all indications that the jury struggled to reach a verdict. A twelfth juror could very well have tipped the balance or brought about a deadlock.

23

The nature of the crimes charged is significant. As the government acknowledges, the case did not depend on the jury's evaluation of witness credibility. Rather, the question was what was in Johnson's mind -- whether the statements were a serious expression of an intent to kill. The evidence central to the government's case was Johnson's videos of Gutfeld, Senator Manchin, Representative Boebert, and Ingraham appearing on Fox News and his statements recorded therein. These videos were made by Johnson alone in his own home in early 2021, and they showed the four subjects as they each appeared on live television to discuss various political issues. In each video Johnson made similar, but not identical, statements about killing one of the subjects. The videos were posted on Johnson's own Instagram account, as to which he had only one follower, and which was registered to his actual phone number.

The district court properly instructed that, to constitute a "true threat," the jury had to conclude beyond a reasonable doubt that "a reasonable person who heard or read the statement would understand it as a serious expression of an intent to inflict bodily injury or to kill." App'x at 498. The district court also informed the jury that it could make this determination by

24

considering the "context in which [the statement] was made, the language that the defendant used, the reaction of those who heard or learned of the statement, and the effect, if any, on the subject." *Id.* Jurors are entitled, of course, to rely on their common knowledge and life experience in drawing inferences and reaching conclusions. *See United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008); *Dawson v. Delaware*, 503 U.S. 159, 171 (1992) (Thomas, *J.*, dissenting) ("Jurors do not leave their knowledge of the world behind when they enter a courtroom . . . .").

Johnson's conduct was manifestly erratic, and it is not at all surprising that the jurors raised the issue of his mental stability. A reasonable jury surely could have concluded that no reasonable person would understand Johnson's statements in context as genuinely expressing an intent to kill. He made the statements when he was home alone watching television, in the midst of the COVID-19 pandemic, while ranting in response to content he was viewing on political news programs. He posted the videos to his own Instagram account, without any detail as to when or how he would carry out the threats, and without any evidence that he took any steps to follow through. Accordingly, in my view, the government's evidence here was not strong. *See United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) ("We have repeatedly held that the

25

strength of the government's case is the most critical factor in assessing whether error was harmless.").

Even if the government offered "enough [evidence] to support the result," harmless-error review requires more. *See Kotteakos*, 328 U.S. at 765; *Gupta*, 747 F.3d at 133. Again, it is the government's burden to show that the error was harmless, and it has failed to meet that burden here.

**IV.**

Johnson's convictions should be vacated because the district court deprived him of a verdict of twelve jurors, absent his consent. Such an error is structural, or in the alternative, prejudiced Johnson. I therefore dissent from the majority's decision to affirm the verdict of the eleven-member jury.

26